**RECEIVED** THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

JUN 1 7 2008

JAMES ~JNINI, CLERK
COLUMBUS, OHIO

John Henricks
(ENTER ABOVE THE NAME OF THE PLAINTIFF IN THIS ACTION)

IF THE PLAINTIFF IS A PRISONER:       PRISONER # 497-528

vs.

Pickaway Correctional Institution
(ENTER ABOVE THE NAME OF THE DEFENDANT IN THIS ACTION)

IF THERE ARE ADDITIONAL DEFENDANTS PLEASE LIST THEM:

Ohio Department of Rehabilitation
and Corrections
Corrections Medical Center

James Erwin

2 : 08 cv 580

JUDGE SMITH

MAGISTRATE JUDGE ABEL

COMPLAINT

I.    PARTIES TO THE ACTION:

PLAINTIFF:    PLACE YOUR NAME AND ADDRESS ON THE LINES BELOW. THE
ADDRESS YOU GIVE MUST BE THE ADDRESS THAT THE COURT MAY
CONTACT YOU AND MAIL DOCUMENTS TO YOU. A TELEPHONE
NUMBER IS REQUIRED.

John Kris Henricks
NAME - FULL NAME PLEASE - PRINT

11781 St. Rte. 762, P.O. Box 209
ADDRESS: STREET, CITY, STATE AND ZIP CODE

Orient, Ohio, 43146

419-822-3494 (Mother's home phone)
TELEPHONE NUMBER

IF THERE ARE ADDITIONAL PLAINTIFFS IN THIS SUIT, A SEPARATE PIECE OF PAPER
SHOULD BE ATTACHED IMMEDIATELY BEHIND THIS PAGE WITH THEIR FULL NAMES,
ADDRESSES AND TELEPHONE NUMBERS. IF NO ADDITIONAL PLAINTIFFS EXIST CONTINUE
WITH THIS FORM.

PAGE 2 AND 3 OF THIS FORM DEAL ONLY WITH A PLAINTIFF THAT IS INCARCERATED
AT THE TIME OF FILING THIS COMPLAINT.

-1-

ADDITIONAL DEFENDANTS:

Warden Alan lazaroff                    Doctor Irina Pleister

Tobie Valentine

P.C.I. Doctor Gonzales

Corrections Officer Maynard

Roger Kirk

R.N. Jane Doe

R.N. Jenny Doe

R.N. John Doe

Ohio State University
Medical Center

Doctor Scott B. Armen

Doctor Richard Fries

Doctor Katz

IF YOU ARE A PRISONER FILING A CIVIL SUIT THE FOLLOWING INFORMATION IS REQUIRED:

PREVIOUS LAWSUITS:

A.  HAVE YOU BEGUN OTHER LAWSUITS IN STATE OR FEDERAL COURT DEALING WITH THE SAME FACTS INVOLVED IN THIS ACTION OR OTHERWISE RELATING TO YOUR IMPRISONMENT? YES ( ) NO (X

B.  IF YOUR ANSWER TO A IS YES, DESCRIBE THE LAWSUIT IN THE SPACE BELOW. (IF THERE IS MORE THAN ONE LAWSUIT, DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THE SAME OUTLINE.)

1.  PARTIES TO THIS PREVIOUS LAWSUIT

PLAINTIFFS:

_____

_____

_____

DEFENDANTS:

_____

_____

_____

2.  COURT (IF FEDERAL COURT, NAME THE DISTRICT: IF STATE COURT , NAME THE COUNTY)

_____

3.  DOCKET NUMBER

_____

4.  NAME OF THE JUDGE TO WHOM THE CASE WAS ASSIGNED

_____

5.  DISPOSITION (FOR EXAMPLE, WAS THE CASE DISMISSED? WAS IT APPEALED? IS IT STILL PENDING?)

_____

6.  APPROXIMATE DATE OF THE FILING OF THE LAWSUIT

_____

7.  APPROXIMATE DATE OF THE DISPOSITION

_____

PLACE OF PRESENT CONFINEMENT

Pickaway Correctional Institution, Orient, Ohio

A. IS THERE A PRISONER GRIEVANCE PROCEDURE IN THIS INSTITUTION?
YES (x) NO ( )

B. DID YOU PRESENT THE FACTS RELATING TO YOUR COMPLAINT IN THIS STATE
PRISONER GRIEVANCE PROCEDURE? YES XX NO ( )

C. IF YOUR ANSWER IS YES:

1. WHAT STEPS DID YOU TAKE?

Informal Complaint Resolution

Notification of Grievance

Appeal to the Chief Inspector

2. WHAT WAS THE RESULT?

All respondents denied any wrongdoing on the

part of actors complained of

D. IF YOUR ANSWER IS NO, EXPLAIN WHY NOT.

E. IF THERE IS NO PRISON GRIEVANCE PROCEDURE IN THIS INSTITUTION, DID
YOU COMPLAIN TO PRISON AUTHORITIES? YES ( ) NO ( )

F. IF YOUR ANSWER IS YES:

1. WHAT STEPS DID YOU TAKE?

2. WHAT WAS THE RESULT?

DEFENDANTS:

PLACE THE NAME AND ADDRESS OF EACH DEFENDANT YOU LISTED IN THE CAPTION ON
THE FIRST PAGE OF THIS COMPLAINT. THIS FORM IS INVALID UNLESS EACH DEFENDANT
APPEARS WITH FULL ADDRESS FOR PROPER SERVICE.

1. Pickaway Correctional Institution
NAMES - FULL NAME PLEASE

11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146
ADDRESS - STREET, CITY, STATE AND ZIP CODE

2. Ohio Department of Rehabilitation and Corrections

1050 Freeway Drive North, Columbus, Ohio, 43229

3. James Erwin (Last known address)

11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

4. Alan Lazaroff, Warden

11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

5. Tobie Valentine, H.C.A., Pickaway Correctional

11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

6. P.C.I. Doctor Gonzales-Lockhart

11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

IF THERE ARE ADDITIONAL DEFENDANTS, PLEASE CONTINUE LISTING THEM.

Corrections Officer Maynard, P.C.I.
11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

Roger Kirk, R.N. (Last known address)
11781 St. Rte. 762, P.O. Box 209, Orient, Ohio, 43146

R.N. Jane Doe, Corrections Medical Center
1990 Harmon Avenue.
Columbus, Ohio,      43223

R.N. Jenny Doe, Corrections Medical Center
1990 Harmon Avenue
Columbus, Ohio,            43223

R.N. John Doe, Corrections Medical
1990 Harmon Avenue, Columbus, Ohio
 43223
Ohio State University Medical Center
410 West 10th Avenue, Columbus, Ohio, 43229

-4-

Doctor Scott B. Armen
Ohio State University
Medical Center
410 West 10th Avenue
Columbus, Ohio, 43229


Doctor Richard Fries
Ohio State University
Medical Center
410 West 10th Avenue,
Columbus, Ohio, 43229


Doctor Katz
Ohio State University
Medical Center
Columbus, Ohio, 43229


Doctor Irina Pleister
Ohio State University
Medical Center
410 West 10th Avenue,
Columbus, Ohio, 43229

STATEMENT OF CLAIM

(1)  Mr. Henricks' unfortunate incident began on August 19, 2006, when he reported to P.C.I. med-bay and reported to R.N. Roger Kirk, complaining of nausea, vomitting, and severe lower abdominal pain. As the symptoms Mr. Henricks exhibited are those attributed to acute appendicitis, R.N. Kirk did a cursory exam for such; however, R.N. Kirk was not performing the usual procedure correctly. R.N. Kirk was basically applying examination techniques used to diagnose a hernia, which resulted in his ruling out appendicitis, and sending Mr. Henricks back to his housing unit with the misinformed diagnosis of the flu.

(2) The following day, Mr. Henricks' symptoms worsened, again he returned to med-bay, and again Nurse Kirk applied the improper techniques; Nurse Kirk again instructed Mr. Henricks to return to his housing unit, to  "let it (the flu) run its course". Before Mr. Henricks left med-bay, another R.N. came on duty, and noted that Mr. Henricks was exhibiting all the symptoms of acute appendicitis and, after consulting with Nurse Kirk, asked to see the techniques he applied on Mr. Henricks. After this second R.N. determined that Nurse Kirk was not properly examining Mr. Henricks, telephoned P.C.I. Medical Director Dr. Gonzales at her home, and reported his observations of Mr. Henricks' symptoms, whereas Dr. Gonzales ordered that Mr. Henricks be taken to O.S.U. Med. Ctr. emergency room.

(3)  At O.S.U. emergency room, P.C.I. Transportation Officer Maynard refused the attending E.R. physician's request to remove Mr. Henricks' belly chain, handcuffs, and shackles, so that he could properly examine Mr. Henricks.  This officer's refusal

(1)

created substantial undue delay and increased risk of fatality, as the appendix had burst the day prior, when Mr. Henricks first reported to P.C.I. med-bay. These delays combined to create the need for much more invasive surgery, to clean out all the toxins that had accumulated in Mr. Henricks' abdominal cavity.

(4) After much unnecessary delay, Mr. Henricks was eventually undressed for proper examination, and rushed into emergency surgery; O.S.U. surgeons Dr. Armen (Attending), Dr. Fries, and Dr. Pleister performed the surgery. During the now much more invasive surgery, surgical error resulted in irrepairable damage to a primary nerve in Mr. Henricks' abdomen, leading to his right leg. This invasive surgery also resulted in gross disfigurement to Mr. Henricks' abdomen, as the surgical incision left a scar from just below his sternum downward to just above his pubic area, that reaches nearly four inches across, one inch deep, in the area where his navel once was. The navel is now about two inches off-center to his right.

(5) Mr. Henricks was eventually taken to C.M.C., once his condition was stable, for recovery. Wound care nurses at C.M.C., whose names are unavailable pending discovery responses, at times cleaned his surgical wound with ordinary tap water from the inmate/patient restroom, at times failed to address his wound care altogether and, as a direct result of this wanton and reckless behavior, Mr. Henricks contracted a serious and often fatal M.R.S.A. (Staph) infection in and around his surgical wound, creating much additional unnecessary pain and suffering, both physically and mentally.

(2)

(6)   After Mr. Henricks had spent several weeks convalescing at C.M.C., the subject of his discharge back to P.C.I. came up. One of the O.S.U. surgeons responsible for his surgery stated that, based on what he had seen of P.C.I.'s ability to care for such inmates as Mr. Henricks, he was not comfortable releasing this patient back into the hands of such obviously deficient health-care providers. Yet one day after these statements, Mr. Henricks was recklessly discharged back into that environment.

(7)   Dr. Katz is an O.S.U. physician who often serves as the "Attending" at C.M.C.'s followup clinics. O.S.U. has found it more convenient to schedule folloup visits with prisoner/patients at this facility than to have them all returned to O.S.U. on a regular basis; C.M.C. also has the necessary security already in place, and it allows the O.S.U. physicians to check in on those patients still convalescing at C.M.C. Dr. Katz has thus seen the plaintiff at C.M.C. several times. An E.M.G. (nerve conductivity test) was performed on Mr. Henricks' right leg on October 11, 2006, by O.S.U. Neurologists at C.M.C., which con-firmed the nerve damage to  Mr. Henricks' leg, and Dr. Katz had occasion to review these findings, including the conclusion by neurologists that this damage was "definitely" caused by surg-ical error. Yet Dr. Katz refused to take any steps to relieve Mr. Henricks from the constant pain and suffering brought about by the surgical errors, or to order the recommended secondary surgery(s) to correct the grossly disfiguring scarring on his abdomen. Dr. Katz' position on the secondary surgery(s) is, and

(3)

he has made this abundantly clear to the plaintiff, "We saved your life! What more do you expect of us?"

(8)  O.S.U. Neurologists have prescribed the drug Neurontin for the ever-increasing and at times unbearable pains in his leg brought on by the nerve damage, several times. However, each time they do so, Dr. Gonzales at P.C.I. turns him down. Ibuprofen is the painkiller of choice by Dr. Gonzales. During the brief time he was given the Neurontin by another physician, it brought a great deal of relief from the pain, (it is the only thing that has ever brought any relief at all), but it is not given to anyone at P.C.I., unless they suffer from seizures. Mr. Henricks has not requested  any opiates, or other addictive drugs usually prescribed for such pain, only what the "Specialists" have prescribed.

(9)  Dr. Gonzales has in fact altered almost every medication and/or treatment schedule ordered by O.S.U. doctors for the plaintiff, including cancelling further consults with O.S.U. physicians for Mr. Henricks; It is supposedly O.D.R.C. policy that, every medication and/or treatment and/or restriction recommended by physicians outside of this institution are just that- "recommendations", not orders. The final word, no matter how much more qualified these doctors are than Dr. Gonzales is, is up to Dr. Gonzales.

(10) Please see Mr. Henricks' Comprehensive Sworn Statement of claim in Plaintiff's Appendix A for more details. In Plaintiff's Appendix B is a summary of Plaintiff's exhaustive attempts to correct Defendants' negligence via the grievance procedure currently in place within O.D.R.C. facilities.

(4)

followed by copies of the three-tier process regarding his com-
plaints.

(11)  Any of the named physicians could order that Mr. Henricks
be returned to O.S.U. for corrective surgery, to try to repair
the disfigurement left from the initial surgery, but refuse to
do so. It has now been so long since the initial surgery that
it will likely take several surgeries, involving skin grafts,
and much more invasive means than would have been necessary
had this been done as soon as the fear of infection was passed,
as Mr. Henricks had been led to believe was the plan. The
plaintiff contends that the reconstructive surgery is required
to correct the disfiguration caused by the reckless negligence
of O.S.U. surgeons acting as agents of the State under color
of law.

(12)  The stress created by this entire incident was largely to
blame for a recent, near-fatal heart attack Mr. Henricks suf-
ferred on April 22, 2008. Heart surgery and a nine day stay
in the hospital were followed a mere week after his discharge
with orders to work in the institution's chow hall, perhaps
the most physically demanding work environment at P.C.I.

(13)  O.S.U. surgeons could have treated Mr. Henricks' other
deformities while he was there following his heart attack,
once his heart condition was well stabilized, but chose  not
to do so.

(14)  Plaintiff Mr. Henricks did not have the option of choos-
ing his healthcare providers. Mr. Henricks was shackled and
chained, and under armed guard 24 hours a day, while at O.S.U.,

(5)

and equally well confined at C.M.C., forced to accept whatever treatment State actors employed, and then expected to quietly suffer the pain and agony of these actors' reckless, willfull, and negligent treatment of him. This is the exact type of State sanctioned activities that compelled Representative Shella-burger to take the floor of the 1871 Congress and sponsor H.R. 320, (see Globe.App..69) followed by Representative Bing-ham, the author of § 1 of the Fourteenth Amendment.(see Globe. App..81)

(6)

**RELIEF**

IN THIS SECTION PLEASE STATE (WRITE) BRIEFLY EXACTLY WHAT YOU WANT THE COURT TO DO FOR YOU. MAKE NO LEGAL ARGUMENT, CITE NO CASES OR STATUTES.

One Hundred Million Dollars ($100,000,000.oo)

Injunctive relief (Where applicable)

Compensatory relief (Where applicable)

Monetary damages (Where applicable)

Punitive damages (Where applicable)

are sought individually, severally, and jointly.

SIGNED THIS 12ᵗʰ DAY OF June 20 0 8.

SIGNATURE OF PLAINTIFF

-6-

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION


John Henricks, #497-528   :   Case No._____

11781 St. Rte. 762,

P.O. Box 209        :   Magistrate:

Orient, Ohio, 43146

   Plaintiff,     :

             Judge:

            :

  vs.

            :   JURY DEMAND

Pickaway Correctional    :

Institution

11781 St. Rte. 762     :

P.O. Box 209

Orient, Ohio, 43146    :

   Defendant.

            :


Ohio Department of     :

Rehabilitation and

Corrections       :

1050 Freeway Drive North

Columbus, Ohio, 43229   :

   Defendant.

            :


Corrections medical Center :

1990 Harmon Avenue,

Columbus, Ohio, 43223   :

   Defendant.

            :


James Erwin       :


Last known address:    :

Pickaway Correctional

Institution,       :

11781 St. Rte. 762

P.O. Box 209,      :

Orient, Ohio, 43146

   Defendant.     :

            :


(1)

Warden Alan Lazaroff          :     Case No._____
Pickaway Correctional
Institution                   :
11781 St. Rte. 762            :     Magistrate:
P.O. Box 209
Orient, Ohio, 43146           :
          Defendant.          :     Judge:

                              :

Tobie Valentine              :
Healthcare Administrator
Pickaway Correctional         :
Institution
11781 St. Rte. 762            :
P.O. Box 209
Orient, Ohio, 43146           :
          Defendant.
                              :


                              :

P.C.I. Medical Director       :
Doctor Gonzales
Pickaway Correctional         :
Institution
11781 St. Rte. 762            :
P.O. Box 209
Orient, Ohio, 43146           :
          Defendant.
                              :


Officer Maynard              :
Pickaway Correctional
Institution                   :
11781 St. Rte. 762
P.O. Box 209                  :
Orient, Ohio, 43146
          Defendant.          :

                              :


R.N. Roger Kirk              :

                              :
Last known address:
Pickaway Correctional         :
Institution
11781 St. Rte. 762            :
P.O. Box 209
Orient, Ohio, 43146           :
          Defendant.
                              :


(2)

R.N. Jane Doe    :  Case No._____
(Identity currently unknown) :
Corrections Medical Center :
1990 Harmon Avenue    :  Magistrate:
Columbus, Ohio, 43223   :
    Defendant.    :
            :  Judge:

R.N. Jenny Doe    :
(Identity currently unknown) :
Corrections Medical Center :
1990 Harmon Avenue    :
Columbus, Ohio, 43223   :
    Defendant.    :
            :

R.N. John Doe     :
(Identity currently unknown) :
Corrections Medical Center :
1990 Harmon Avenue    :
Columbus, Ohio,43223   :
    Defendant.    :
            :

Ohio State University   :
Medical Center     :
410 West 10th Avenue   :
Columbus, Ohio, 43229   :
    Defendant.    :
            :

Doctor Scott B. Armen  :
Last known address:   :
Ohio State University   :
Medical Center     :
410 West 10th Avenue   :
Columbus, Ohio, 43229   :
    Defendant.    :
            :

Doctor Richard Fries   :
Last known address:   :
Ohio State University   :
Medical Center     :
410 West 10th Avenue   :
Columbus, Ohio, 43229   :
Defendant.      :

(3)

Doctor Katz
Last known address:                  :    Case No._____
Ohio State University                :
Medical Center
410 West 10th Avenue                 :    Magistrate:
Columbus, Ohio, 43229                :
      Defendant.                :    Judge:
                                     :
                                     :
                                     :
Doctor Irina Pleister                :
Last known address:                  :
Ohio State University                :
Medical Center
410 West 10th Avenue,                :
Columbus, Ohio, 43229                :
      Defendant.                :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :

(4)

CAUSE.OF.ACTIONS

Ohio.Department.of.Rehabilitation.and.Corrections, hereinafter referred to as O.D.R.C., having an ongoing duty to provide adequate medical care to prisoners entrusted to their custody during their court-imposed confinement(s), did recklessly, knowingly, and willfully neglect to provide adequate medical care, resulting in substantial physical and mental injury to prisoner/plaintiff John Henricks, while in their custody, thereby exhibiting deliberate indifference to plaintiff's pain and suffering.

Pickaway.Correctional.Institution, hereinafter referred to as P.C.I., having an ongoing duty to provide adequate medical care to prisoners entrusted to their custody during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide adequate medical care needs, resulting in substantial permanent and irrepairable physical and mental injury to prisoner/plaintiff John Henricks, while in their custody, and now exhibits deliberate indifference to said plaintiff's pain and suffering.

Corrections.Medical.Center, hereinafter referred to as C.M.C., having an ongoing duty to provide adequate medical care to prisoners entrusted to their care and confinement during court-imposed confinement, did recklessly, knowingly, and willfully

(5)

neglect to provide adequate medical care needs resulting in substantial permanent and irrepairable physical and mental injury to prisoner/plaintiff John Henricks while in their custody, and now exhibits a deliberate indifference to said plaintiff's pain and suffering.

James Erwin, former Warden at P.C.I., had an ongoing duty to provide adequate medical care to prisoners entrusted  to his custody during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide adequate medical needs , resulting in substantial permanent and irrepairable physical and mental injury to prisoner/plaintiff John Henricks while in his care and custody, then exhibited a deliberate indifference to said plaintiff's pain and suffering.

Alan Lazaroff, current Warden of P.C.I., having an ingoing duty to provide adequate medical care to prisoners entrusted to his custody during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide adequate medical care needs, resulting in substantial permanent and irrepairable physical and mental injury to prisoner/plaintiff John Henricks, while in his custody, and now exhibits a deliberate indifference to said plaintiff's pain and suffering.

(6)

***It should be noted at this point that James Erwin was removed from his position of authority as P.C.I. Warden for recklessly neglecting to implement health care policies that resulted in the deaths of prisoners in his custody, inter alia, and was replaced by Alan Lazaroff, who now enforces James Erwin's deficient health care policies, without attempting to alter the policies and/or customs that inflict undue injury to prisoners in his custody.

Tobie Valentine, Healthcare Administrator, hereinafter referred to as H.C.A., in direct control of the administration of health care at P.C.I., having an ongoing duty to implement policies and/or customs that provide for adequate medical care to prisoners entrusted to the care and custody of P.C.I. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide adequate medical care needs, resulting in substantial permanent physical and mental injury to prisoner/plaintiff John Henricks, and now exhibits a continuing deliberate indifference to said plaintiff's pain and suffering.

Doctor Gonzales, P.C.I. Medical Director, having an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of P.C.I. by court-imposed confinement, did recklessly, knowingly, and wilfully neglect to administer reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent and irrepairable physical and mental injury, and now exhibits a deliberate indifference to said plaintiff's pain and suffering.

(7)

Roger.Kirk, a Registered Nurse employed at P.C.I., had an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of P.C.I. by court-imposed confinement, did recklessly, knowingly, and willfully neglect to administer reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent and irrepairable physical and mental injury, then exhibited a deliberate indifference to said plaintiff's pain and suffering.

Officer.Maynard a corrections officer employed by P.C.I., when assigned the task of transporting prisoners entrusted to the custody of P.C.I. during court-imposed confinement, to outside medical care facilities, had an ongoing duty to transport said prisoners in a safe, secure, and expedient manner, did recklessly, and willfully delay prisoner/plaintiff John Henricks from receiving emergency medical treatment, resulting in permanent and irrepairable physical and mental injury to said plaintiff.

Jane.Doe,.a.Wound.Care.Nurse.employed.by.C.M.C., had an ongoing duty to provide adequate and substantial care to prisoners entrusted to the custody of C.M.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to administer reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent and iirepairable injury to said plaintiff.

(8)

Jenny.Doe,.a.Wound.Care.Nurse.employed.by.C.M.C.,had an ongoing duty to provide adequate and substantial medical care to prisoners entrusted to the custody of C.M.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to administer reasonable and substantial medical care needs to prisoner/ plaintiff John Henricks, resulting in permanent and irrepairable injury to said plaintiff.

John.Doe,.a.Wound.Care.Nurse.employed.by.C.M.C.,had an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of C.M.C. during court-imposed confinement, did recklessly, and willfully neglect to administer reasonable and substantial medical care needs to prisoner /plaintiff John Henricks, resulting in permanent and irrepairable physical and mental injury to said plaintiff.

Ohio.State.University.Medical.Center, hereinafter referred to as O.S.U. Med. Ctr.,under contract with O.D.R.C.,has an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of O.D.R.C.during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide reasonaable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent and irrepairable mental and physical injury to said plaintiff, and now exhibits a deliberate indifference to said plaintiff's pain and suffering.

(9)

Doctor Scott B. Armen, Surgeon, employed by O.S.U. Med. Ctr., having an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of O.D.R.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide substantial and reasonable medical care needs to prisoner/plaintiff John Henricks, resulting in permanent mental and physical injury to said plaintiff, and now exhibits a deliberate indifference to his ongoing needs, to his pain and suffering.

Doctor Richard Fries, Surgeon, employed by O.S.U. Med. Ctr., having an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of O.D.R.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent mental and physical injury to said plaintiff, and now exhibits a deliberate indifference to his ongoing needs, to his pain and suffering.

Doctor Irina Pleister, Surgeon, employed by O.S.U. Med. Ctr., having an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of O.D.R.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in

(10)

permanent and irrepairable physical and mental injury to said plaintiff, and now exhibits a deliberate indifference to his on-going needs, to his pain and suffering.

Doctor.Katz,.employed.by.O.S.U..Med..Ctr.,as an Attending Physician at C.M.C. Clinics, has an ongoing duty to provide adequate medical care to prisoners entrusted to the custody of O.D.R.C. during court-imposed confinement, did recklessly, knowingly, and willfully neglect to provide reasonable and substantial medical care needs to prisoner/plaintiff John Henricks, resulting in permanent and irrepairable physical and mental injury to said plaintiff, and now exhibits a deliberate indifference to his ongoing needs, to his pain and suffering.

(11)

JURISDICTION STATEMENT

1.) Plaintiff brings this action under 42 U.S.C.§1983 as principal parties operated under color of law; and doctrine of pendent jurisdiction as the relatedness of the claims makes them part of the same Constitutional case under 28 U.S.C.A. §1367.

2.) Black's Law Dictionary defines malpractice as "any professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties, evil practice, or illegal or immoral conduct." Black's Law Dictionary (6th Ed. 1990) 959.

3.) The Ohio Supreme Court has defined malpractice as professional misconduct, i.e., the failure of one rendering services in the practice of a profession to exercise that degree of skill and learning normally applied by members of that profession in similar circumstances. Strock v. Pressnell (1998), 38 Ohio St. 3d 207, 211; 527 N.E. 2d 1235, Bunce v. Parkside Lodge of Columbus, 73 Ohio App. 3d. 253; 596 N.E. 2d. 1106 (10th Dist. Franklin County 1991.) As such, while Plaintiff in the case sub judice does demonstrate Constitutional deprivations that rise to the level of Federal jurisdiction, this case also is permeated with State Court claims, and petitions this Court for jurisdiction of entire controversy.

4.) The Ohio Department of Rehabilitation and Corrections (O.D.R.C.) has a possible written policy that delineates adequate medical care to prisoners entrusted to their custody by court-imposed confinement; however, O.D.R.C. also has unwrtten policies or customs in place to not enforce its own written policies. O.D.R.C. also employs hiring practices and customs that are fatal to a vicarious liability defense. O.D.R.C. hiring and/or Medical services contraction customs extend to the entities under their authority and control. Entities under O.D.R.C. control such as Pickaway

(1)

Correctional Institution (P.C.I.) and Corrections Medical Center (C.M.C.O are given discretion in determining subjective medical personnel, yet O.D.R.C. has the ultimate authority, and exerts control with purse strings. P.C.I. and C.M.C. do owe the prisoners entrusted to their custody an obligation to monitor health care, and to respond reasonably to deficient health care. Policy and customs in place restrain specialists from administering adequate and reasonable health care.

5.) The Plaintiff in the case sub judice, due to human error, suffered first because an emergency medical situation was not properly handled due to professional misconduct, then, due to surgical error, this Plaintiff suffered irrepairable nerve damage, as well as gross disfigurement. C.M.C. wound care customs and policies, that being to administer medical needs as unqualified individuals saw fit, created further injury to the Plaintiff who, now due to extensive topical infection and poor surgery procedure, has a grossly disfigured body, adding mental insult to the physical injury.

6.) Through clear and convincing evidence the Plaintiff demonstrates that the deliberate indifference to his pain and suffering, which now rises above the physical injury. It is worth noting here that nearly 22 months have now passed since the Plaintiff's initial problems began. Yet neither P.C.I., nor O.S.U., nor C.M.C., nor O.D.R.C. has made even a feeble effort to correct their wrongs. The Plaintiff, a prisoner, has serious medical needs, the indifference to which constitutes unnecessary and wanton infliction of pain; anathema to the "obligation" of which Representative Poland spoke of regarding "civil liability" when sponsoring the Civil Rights Act of 1871.

(2)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| JOHN HENRICKS,<br>      Plaintiff, | : | Case No. |
| | : | |
| vs. | : | Magistrate: |
| | : | |
| OHIO DEPARTMENT OF<br>REHABILITATION<br>AND CORRECTIONS,<br>      Defendant. | : | Judge: |
| | : | |

Plaintiff hereby requires initial disclosure of Defendant O.D.R.C., pursuant to Fed. R. Civ. P. Rule 26, to include but not be limited to:

(1) Medical care policies in place on 19-August, 2006;

(2) Hiring policies regarding medical personnel in place on 19-August, 2006;

> (a) Doctors and specialists;
>
> (b) Nurses, R.N.s, and L.P.N.s;
>
> (c) Contracted medical care providers;

(3) Additional training procedures for emergency medical transport personnel in place on 19-August, 2006;

(4) Duties of Chief Inspector investigating medical grievances on 19-August, 2006;

(5) Additional training procedures qualifying a medical grievance investigator in place on 19-August, 2006;

(6) Medical Malpractice Indemnity in place on 19-August, 2006;

(7) Grievances and appeals filed with the Chief Inspector of same or similar import, from December 2004 to date.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN HENRICKS          :          CASE NO.
    Plaintiff,
                       :
vs.                    :   MAGISTRATE:

                       :
CORRECTIONS MEDICAL        JUDGE:
CENTER,                :
    Defendant.
                       :

. . . . . . . . . . . . . . . . . . . . . . . . . . . :. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Plaintiff hereby requires initial disclosure of Defendant

C.M.C., pursuant to Fed. R. Civ. P. Rule 26, to include, but be

limited to:

(1) Hiring policies regarding medical personnel as of 1-Sept-

ember, 2006;

     (a) Doctors and specialists;

     (b) Nurses, R.N.s, and L.P.N.s;

     (c)  Medical care providers contracted.

(2) Qualifying Documentation permitting "Attending" physicians

(from O.S.U.) to treat prisoners in C.M.C. custody as of 1-Sept-

ember, 2006;

(3) Names and addresses of all nurses providing wound care to

Plaintiff from !-September, 2006, through 1-October, 2006;

(4) Names and addresses of all "attending" physicians and spec-

ialists providing medical services to Plaintiff from 1-Sep-

tember, 2006, through 1- January, 2007, including outpatient

clinics;

(5) All medical records pertaining to Plaintiff, including

outpatient clinics;

(6) Medical Malpractice Indemnity on 2-September, 2006.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| JOHN HENRICKS | : | |
|     Plaintiff, | : | Case No. |
| | : | |
| vs. | : | Magistrate: |
| | : | |
| PICKAWAY CORRECTIONAL | : | |
| INSTITUTION | : | Judge: |
|     Defendant | : | |

--------------------------------------------------------------------------------

Plaintiff hereby requires initial disclosure of Defendant P.C.I., pursuant to Fed. R. Civ. P. Rule 26, to include, but not be limited to:

(1) Medical care policies in place on 1 October, 2006;

(2) Employment prerequisites pertaining to:

    (a) Doctor, Physician, Specialists;

    (b) Nurses, R.N.s, L.P.N.s;

    (c) Medical staffing agencies;

    (d) Emergency Medical Transport Personnel;

(3) Names and addresses of medical personnel employed on August 19, 2006;

(4) Names and addresses of medical personnel employed on January 1, 2007;

(5) Medical records of Plaintiff;

(6) Policies on specialist consultations on September 20, 2006;

(7) Nurse protocol on August 20, 2006;

(8) attending physician protocol on August 20, 2006.

(9) Telemde conferencing protocol on August 20, 2006;

(10) Institutional Inspector's files pertaining to investigation of Plaintiff's informal complaints and grievances;

(11) Qualifying documentation of persons responsible for investigations of medical grievances on December 1, 2006;

(1)

(12) Procedures of dispensing medications prescribed by  specialists on November 1, 2006;

(13) Policy of correction surgical error(s) on December 1, 2006;

(14) Employee pay schedule on December 1, 2006, pertaining to:

    (a) Doctor, physicians, specialists;

    (b) Nurses, R.N.s, L.P.N.s;

    (c) Medical staffing agencies;

(15) Person(s) names and addresses responsible for verifying education and employment background of new hires in the Health Administration Dept.;

(16) Medical Malpractice Indemnity on November 1, 2006; Name of underwriter, fixed liability, and yearly premiums.

(2)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

JOHN HENRICKS                           :         Case No.
        Plaintiff,
                                        :
                                        :         Magistrate:
vs.                                     :
                                        :
                                        :         Judge:
OHIO STATE UNIVERSITY                   :
MEDICAL CENTER,                         :
        Defendant.                      :

----------------------------------------:----------------------------------------

        Plaintiff hereby requires initial disclosure of Defendant O.S.U. Med.

Ctr., pursuant to Fed. R. Civ. P. Rule 26, to include, but not limitted to:

(1) Documentation of relationship, on September 1, 2006, relating to:

    (a) Ohio Department of Rehabilitation and Corrections;

    (b) Pickaway Correctional Institution;

    (c) Corrections Medical Center;

(2) Definition of Surgical Error;

(3) Policies delineating correction of surgical error;

(4) Policies on standard of medical care provided to prisoners delivered

to your custody for medical treatment on September 1, 2006;

(5) Policies pertaining to post-surgical recovery consultations for

prisoner on September 1, 2006;

(6) Names and addresses of medical personnel present during

Plaintiff's surgical procedure on August 20, 2006.

(7) Post-surgery orders pertaining to Plaintiff's care;

(8) Medical Malpractice Indemnity pertaining to prisoners en-

trusted to your care on August 20, 2006;

(9) Security provisions in housing prisoner/patients provided

by O.S.U. Medical Center;

(1)

(10) Qualifications of security personnel, i.e. ;

    (a) required to carry weapons;

    (b) ability to effect lawful arrest;

    (c) does hospital security operate under color of law.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


JOHN HENRICKS,                        :         Case No......................
        Plaintiff,
                                      :
                                              Magistrate:
                                      :
vs.
                                      :
                                              Judge:
                                      :
PICKAWAY CORRECTIONAL
INSTITUTION,   Et. al.                :
        Defendants                    :
------------------------------------------------------------------------------------

PLAINTIFF"S APPENDIX  A.

COMPREHENSIVE
STATEMENT OF CLAIM

1) On August 19, 2006, at approximately 2:00 p.m., Plaintiff John Henricks, an inmate at Pickaway Correctional Institution in Orient, Ohio, was sent to the institution's infirmary, complaining of nausea, vommitting, and severe lower abdominal pain.

2) Plaintiff was examined by R.N. Roger Kirk, who was apparently the only healthcare employee present at the time. Nurse Kirk did, without the assistance or guidance of a licensed physician, make the uninformed presumption that Plaintiff's complaints were "definitely not caused by appendicitis", but merely "the flu".

3) The Plaintiff had never mentioned the possibility that his pain and distress involved his appendix, only that he was in extreme pain. Nurse Kirk gave the Plaintiff Maalox, and ordered Plaintiff to return to his housing unit and "let it run its course."

4) On August 20, 2006, at approximately 5:00 a.m., Plaintiff was carried back to infirmary by two inmates; Plaintiff's pain in his lower abdomen was by now unbearable. Once again, Nurse Kirk was the only caregiver seen in med-bay. Nurse Kirk again proclaimed, before even examining the Plaintiff, that his pain and suffering were "definitely not your appendix," but "the flu". At Plaintiff's insistance, he was given a brief cursory examination, but again, without consulting with a licensed physician, made his conclusion that it was merely "the flu", and again ordered the Plaintiff to return to his housing unit.

5) Before the Plaintiff left med-bay, another Nurse, Mr. Guy Barker came on shift, and began to question Nurse Kirk as to

(1)

the Plaintiff's complaints. Nurse Kirk again stated unequivocally, that "it is definitely not appendicitis". Nurse Barker questioned Nurse Kirk as to how he came to this conclusion, and Nurse Kirk demonstrated his methods used.

6) Nurse Barker then examined the Plaintiff himself, showing Nurse Kirk the proper methods in ruling out appendicitis, then immediately phoned P.C.I. Medical Director and primary physician at her home, advising her of his observations of the Plaintiff; Nurse Barker stated that he was fairly certain Plaintiff was indeed suffering from acute appendicitis. Doctor Gonzales then made the informed decision that Plaintiff be sent to O.S.U. Medical Center, as soon as possible.

7) Nurse Barker notified P.C.I. security staff of the need for emergency transport of an inmate to O.S.U. Medical Center.

8) Someone in security apparently felt there was no immediate need for emergency transport by area E.M.S., as two corrections officers weredispatched to transport Plaintiff to the hospital in one of the institution's inmate transport vans. The Plaintiff was undressed, then dressed in one-piece orange coverall, then handcuffed, with belly chains, ankles shackled, then walked out to the waiting van.

9) After many unnecessary delays, Plaintiff entered O.S.U.'s E.R. at 6:32 a.m. C.O. Maynard (transport officer 1) adamantly refused, dispite E.R. physician's repeated requests, to remove prisoner restraints so that Plaintiff could be undressed for proper examination. This officer did not know or did not care for departmental policy and/or procedure, as he stated that he could not remove restraints until the inmate was officially admitted.

(2)

10) E.R. physician stated he must more thoroughly examine the Plaintiff before making the call whether or not to admit, but it was increasinly obvious that Plaintiff's condition was rapidly deteriorating, and equally obvious this officer was not going to comply with the physician's requests.The Plaintiff, during the course of this 45 + minute exchange between doctor and officer, lie on the exam table writhing in pain, pleading for someone to do something.

11) At 7:23 a.m. the physician relented and agreed to admit. Plaintiff's restraints were removed, he was undressed, and examined thoroughly. The diagnosis was acute appendicitis and peritonitis.

12) Plaintiff was "officially" admitted at 8:44 a.m., in "Critical Condition". Abdominal series x-rays were performed, and Plaintiff was admitted to operating room at 9:01 a.m., with Attending Physician Dr. Scott B. Armen. Fully 4 hours after Plaintiff was sent to med-bay, 19 hours after Plaintiff first reported ill.

13) When Plaintiff awoke some time later in recovery, he was advised of the very serious condition he was in at the time of his arrival, and even now; his appendix had not only already ruptured by the time he was brought to the hospital, but was already completely gangrenous, and very invasive measures were necessary in order to save his life. He was also informed that, had he been brought in the previous day, when his symptoms first presented, things would have been much easier for all.

14) Plaintiff also discovered when he awoke from surgery that he had no feeling in his right leg, and immediately notified O.S.U. healthcare staff of this. He was at some point told by physician that the immediate concerns were his abdomen, not his leg.

(3)

15) Plaintiff repeated his complaints involving his loss of feeling in his leg, many times each day, to anyone who came in to care for him, but was never seen by a neurologist during his stay at O.S.U. Medical Center.

16) After five days at O.S.U. Medical Center, he was taken by security staff (again, not by E.M.T.s) to C.M.C. (Corrections Medical Center, an O.D.R.C.facility) wherehe remained as a patient until October 3, 2006.

17) While a patient at C.M.C.,there were several instances in which the care given was questionable, such as; On September 1, 2006, third shift treatment nurse failed to clean, debride, and redress Plaintiff's surgical wound, as ordered by surgeon; Plaintiff filed an informal complaint with Nurse Supervisor on September 2, 2006.

18) On September 7, 2006, third shift treatment nurse again failed to clean, debride, and redress Plaintiff's surgical wound as ordered by surgeon; Plaintiff again filed informal complaint with Nurse Supervisor, on September 10, 2006.

19) On September 9, 2006, first shift treatment nurse did, because he had no sterile Saline on his treatment cart, cleansed Plaintiff's surgical wound with ordinary tap water, drawn from patient bathroom sink. Plaintiff filed informal complaint with Nurse Supervisor on September 10, 2006.

20) A few days after the above mentioned instances, the Plaintiff began to break out in large boils in and around his surgical wound, which were confirmed as a serious staph infection. (MRSA) Antibiotics were ordered.

(4)

21) On October 2, 2006, the Plaintiff was seen by O.S.U. surgeon for weekly in-patient followup visit at C.M.C.. This doctor refused C.M.C.'s request to authorize discharge of the Plaintiff back to Pickaway Correctional Institution, citing obviously deficient and/or incompetent medical care at P.C.I. that nearly cost the Plaintiff his life to begin with.

22) On October 3, 2006, C.M.C. ordered that Plaintiff be discharged, and returned to Pickaway. (Despite O.S.U. surgeon's orders of the previous day ?)

23) NOTE: During the course of his six week hospitalization at Corrections Medical Center, the Plaintiff continued to complain daily about the loss of feeling in his right leg,but was never referred to a neurologist, even though they held weekly Neurology clinics , staffed by O.S.U. Neurologists, at C.M.C.

24) On October 11, 2006, the Plaintiff was returned to C.M.C. outpatient clinic, Neurology. An E.M.G. (nerve conductivity test) was performed in the area of patient's lower right abdomen/groin, leading down his right leg. This test confirmed that there was indeed substantial nerve damage to a nerve "root" leading to/from the Plaintiff's right thigh. Once damage was confirmed, the technician was able to back-track to the general location of the actual damage, pinpointing it to the area where the appendix once was. This left little doubt the damage was directly caused by surgical error. It was further determined  as Not Repairable.

(5)

25) On October 27, 2006, Plaintiff again returned to C.M.C. outpatient clinic, Neurology, to review the results of the E.M.G. performed on October 11, 2006. Dr. Jane Doe, Neurologist from O.S.U. Medical Center, reiterated the conclusions drawn by the doctor who had performed the E.M.G.; the damage was not likely repairable, it was caused by surgical error. She asked the Plaintiff what medicines, if any, the Plaintiff was currently being given for pain at P.C.I.. Ibuprofen, (the magical | This Neurologist stated that "no amount of Ibuprofen or any other conventional NSAID would be the least bit effective for pain caused by nerve damage." The drug Neurontin was ordered for Plaintiff.

26) On October 30, 2006, Plaintiff again returned to C.M.C. outpatient clinic, for regularly scheduled followup visit with surgeons. At this time, the Plaintiff asked if and when additional surgery(s) may be performed, to close up the large crater left in his abdomen. He was told (again) that the wound had to be left open initially, to allow any remaining toxins left from the ruptured appendix to drain, or the area would have likely abcessed. Plaintiff was told that, once the infection and the danger of abcess past, the scar tissue around the edges of the opening would be cut loose, and the skin and subcutaneous tissue sutured shut.

27) On November 1, 2006, Plaintiff finally received his first dose of Neurontin at P.C.I., 100 mg., three times daily.

(6)

28) On November 3, 2006, Plaintiff went to Nurses Sick Call at P.C.I., the obligatory first step to seeing an actual doctor, and asked that the current dosage of Neurontin be increased slightly, as it was not at all effective in managing the ever increasing pain in his right leg. He was told he would be passed to see Dr. Gonzales soon.

29) On November 8, 2006, Plaintiff was seen by Dr. Gonzales, the primary (and only, at the time) physician at P.C.I., who is also Medical Director. Dr. Gonzales stated that "No amount of Neurontin would be effective in managing your pain", and ordered it discontinued altogether. It was replaced with Ibuprofen.

30) On November 29, 2006, and again on December 12, 2006, the Plaintiff returned to C.M.C. outpatient clinic, for surgical followup visits. On at least one of these visits, Plaintiff asked again when the further surgery(s) earlier discussed might take place, to repair the grossly disfiguring scar left in his abdomen. A Dr. Katz, attending surgeon/physician from O.S.U. Medical Center in clinic, informed the Plaintiff that there would be no further surgeries, that "We already saved your life; What more do you expect of us ?"

31) On January 19, 2007, Plaintiff was returned to O.S.U. Medical Center, outpatient, for an M.R.I..(Plaintiff had been led to believe this procedure was being done at the request of Neuro. Dept., to try to determine the exact extent of the nerve damage caused by surgical error.)

(7)

The pain and nervous tics in Plaintiff's leg were so severe that Plaintiff's legs had to be strapped down before the procedure could be successfully completed.

32) OnFebruary 23, 2007, Plaintiff returned to C.M.C. outpatient clinic, Neurology. Plaintiff assumed this visit was scheduled to review M.R.I. results. When asked about the procedure and its resulting conclusions, Dr. Figg, O.S.U. Neurologist stated that Neurology Dept. had requested no such M.R.I., and left the examination room to look into the matter. He returned a short time later, and stated that , once the surgeon(s) became aware of the E.M.G. results , which clearly pointed to surgical error as the cause of the nerve damage, they ordered the procedure, and they were not looking at Plaintiff's leg, but at his lower back, hoping to find some pre-existing spinal problem that could be pointed to as the likely cause of the Plaintiff's nervous problem. (They did not find any such problem.)

33) Within one week of plaintiff's return to P.C.I. on October 3, 2006, Plaintiff was assigned a job as a unit porter, despite the fact that his surgical wound was still bleeding and/or draining, still required thrice-daily cleaning, debriding, and redressing.Despite the many restrictions Plaintiff was or should have been under, for many months after such invasive surgery. This thrice-daily treatment was eventually cut to twice-daily,

as a matter of convenience for medical staff, but was still necessary well into May of 2007.

(8)

34) Plaintiff has returned to C.M.C. Outpatient clinics several times since February of 2007, for followup visits with O.S.U. doctors, neurologists, and surgeons. On at least four occasions neurologists have ordered Neurontin for plaintiff's leg pain, and every time, Dr. Gonzales of P.C.I. has refused to allow it. As Medical Director of P.C.I.,this doctor maintains supreme authority; any medical prescriptions, treatments, restrictions, etc., ordered by any and all physicians outside these prison walls; any of these orders are looked on by her as mere recommendations, nothing more.

35) Dr. Gonzales explained her reasoning for denying Neurontin to the Plaintiff as "The F.D.A. has never officially approved that medication for that particular application". O.S.U. Neurologists response to this line of reasoning was "So what!! We have been prescribing this medicine for similar complaints for years, and it has long  been a very safe and effective treatment!!!"

36) During the many months Plaintiff was made to suffer the excruciating pains that have gradually replaced the initial loss of sensation in plaintiff's right leg, due directly to Dr. Gonzales adamant refusal to authorize Neurontin orders by O.S.U. Neurologists, specialists in their chosen field; Plaintiff fell or collapsed many times,due to the unnecessary pain this medication would have lessened, exposing Plaintiff to further injury.

(9)

37) The Plaintiff has, as surgeons predicted, developed a fist-sized hernia, from the rim of the crater of a scar in his abdomen, upward to just below his ribcage. It hasn't yet ruptured, but the Plaintiff has had to be extremely cautious, even in normal, day-to-day activities, to avoid this very real possibility.

38) Doctor Muhammad, a second physician hired at P.C.I., due to the severe overcrowding of inmates, began treating the Plaintiff in the fall of 2007. This doctor ordered a "binding" to support the abdominal hernia and, upon looking closer at Plaintiff's medical record, asked the Plaintiff why he was not taking the Neurontin prescribed by neurologists.

39) Plaintiff explained the nature and cause of his nerve damage, the fact that the neurologists repeatedly reordered this medication, and Dr. Gonzales' reasoning behind her continued refusal to authorize the medication.

40) Dr. Muhammad stated "That's bullshit!", and ordered 300 mg. neurontin, three times daily, in approximately late December of 2007.

41) The Neurontin has been the only medication given Plaintiff since his surgery to offer any relief whatsoever for the often excruciating pains he has suffered every single day since his August 2006 surgery.

42) Doctor Gonzales is aware, or well should be, that conventional NSAIDs are useless for managing pains associated with nerve damage, yet has continually substituted her knowledge and judgement for that of highly skilled neurologists.

(10)

43) Throughout the course of Plaintiff's convalescence after re-turning to P.C.I., for a period exceeding eight months, surgical wound was still open and bleeding/draining. This required many daily cleaning/debriding/dressing changes and, more than once, Plaintiff's wound became infected, necessitating several power-ful antibiotics, sporadically.

44) Despite the cleaning/debriding/redressing, the antibiotics, the prison environment in general, and P.C.I. specifically, is an out-of-control breeding ground for many infectious commun-icable diseases, some to almost epidemic proportions.

45) Plaintiff's overall health since his emergency appendectomy has never returned to close what it was prior to surgery, phys-ically or emotionally; Plaintiff has never experienced an erec-tion since this surgery, and has at times sunk into a deep and troubling depression, is very self-conscious about the scar(s) left behind. Day-to-day stress levels over these things and others at times make it all but impossible to function normally.

46) Plaintiff suffered a heart attack on April 22, 2008 and, upon his return from the hospital(s) on May 1, 2008,discovered that Doctor Muhammad no longer works at P.C.I. Plaintiff was again forced to see Doctor Gonzales, who, upon finding that Doctor Muhammad had some time ago authorized Neurontin as re-commended by neurologists, promptly took it away.Dr. Gonzales also refused to recommend a medical layin following Plaintiff's heart attack, so, two weeks after heart surgery, Plaintiff was ordered to work, in the chow hall !

( 11 )

47) Plaintiff's surgical incision was down the center of his abdomen, running from about four centimeters above the navel downward approximately fifteen centimeters, to just above the pubic region. The muscle wall was sutured closed following surgery, but the outer skin and underlying subcutaneous tissue were left open to drain, albiet packed with gauze dressings. After ten months, this large  "crater" has fully scarred over, but still remains a deep depression or crater. This "crater" is still approximately twelve centimeters long, eight centimeters wide, and two centimeters deep. The visible wound, then, has now scarred over, but the physical pain and distress associated continues, ranging from mild to severe, depending on the Plaintiff s common everyday movements and activities. The emotional wounds run much deeper, often to the point that Plaintiff cannot sleep through the night. The involuntary spasms in Plaintiff's leg are at times so severe that they too keep the Plaintiff awake at night, or wake him from his sleep.

48) The Plaintiff must now eat several small meals, several times a day, as a "normal size" meal increases the severity of the physical pains that continue.

49) The invasive nature of the surgery, plus the large hernia that has since developed just above the surgical wound, have interrupted the Plaintiff's gastrointestinal system to the point where eight to ten bowel movements each day is an average day, and this has in turn made Plaintiff's hemmerhoids flare up to the point of bleeding.

50) Plaintiff returned to C.M.C. outpatient clinic, for another post-surgical followup, on December 17, 2007. Plaintiff was again seen by O.S.U. Attending Doctor Katz. After examination for Plaintiff's

(12)

lingering pain and discomfort in and around the surgical wound, Dr. Katz wrote an order for Altram, to help manage the Plaintiff's pain and discomfort, as Ibuprofen can further irritate existing stomach problems. Dr. Katz also stated he would refer Plaintiff to a gastroenterologist, to look into Plaintiff's highly irregular bowel and intestinal functioning.

51) Plaintiff was recently passed to P.C.I. Medical for a "telemed" video conference with a gastroenterologist at O.S.U., but the teleconference was postponed at the last minute at the request of the specialist, and has not yet been rescheduled.

52) P.C.I. Doctor Gonzales refused to approve the Altram ordered by Doctor Katz, substituting Ibuprofen in its place, and the Plaintiff continues to suffer the same prolonged and intractable pain he was seen by Doctor Katz for, now over five months ago.

53) The Plaintiff's abdominal hernia has torn further across his abdomen since ordered to work in the institution's chow hall;

54) The Plaintiff was for over a year after his discharge from C.M.C. following his surgery charged the three dollar co-pay for post-surgical doctor visits and prescription medication refill requests at P.C.I., pursuant to Administrative Regulation 5120-5-13, Inmate Financial Responsibility Plan.

(13)

STATE OF OHIO        )
                     ) SS:
COUNTY OF PICKAWAY)

## AFFIDAVIT OF VERITY

I, John K. Henricks, Inmate No.497-528, Complainant, having been first duly sworn, declare under penalty of perjury that the facts as averred in the foregoing Statement of Complaint are true and accurate, to the best of my knowledge, information, and belief.

AFFIANT FURTHER SAYETH NAUGHT:

Sworn to and subscribed in my presence this __10th__ day of __June__, 2008.

_____          _____
Notary                                 John K. Henricks,
                                       Inmate No. 497-528
My commission expires                  Plaintiff, in pro se.
                                       Pickaway Correctional
on____6/28/2009____.                   Institution,
                                       11781 St. Rte. 762,
                                       P.O. Box 209,
                                       Orient, Ohio, 43146



LEON M. WALKER, JR.
Notary Public, State of Ohio
My Commission Expires 6/28/2009

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

JOHN HENRICKS                           :      Case No._____
       Plaintiff,
                             :

                             :      Magistrate:

vs.                                     :

                             :      Judge:

PICKAWAY CORRECTIONAL                   :

INSTITUTION,     Et. al.                :

       Defendants                      :

PLAINTIFF"S APPENDIX  B.

PLAINTIFF GRIEVANCE SUMMARY


Item 1) 2- September, 2006: Informal Complaint Resolution regarding reckless failure to follow wound care orders. Resolution: No action taken. 3rd shift nurse claims wound care orders were followed.

Items 2 and 3) 10-September, 2006: Informal Complaint Resolution regarding reckless failure to follow wound care orders; wound care nurse recklessly contaminates surgical incision area with substandard practices.

Resolution: No action taken. Issue will be addressed AtS.A.P. with concerned shift nurses.

Item 4) 29-September, 2006: Informal Complaint Resolution in regards to Plaintiff still having no feeling in his right leg; Neurology consults not being kept as scheduled.

Resolution: No action taken. C.M.C. Healthcare Administrator states that O.S.U., not C.M.C.,schedules these; further, let doctor know "if you are having discomfort".

Item 5) 6-October, 2006; Informal Complaint Resolution regards Nurse Roger Kirk's negligent malpractice acts.

Resolution: No action taken. P.C.I. Healthcare Administrator Valentine states "treatment was rendered appropriately".

Item 6) 13-October, 2006: Informal Comlpaint Resolution regards transpoftation officer Maynard refusing to remove prisoner restraints at O.S.U. Emergency Room as physician requested, for proper examination/evaluation of Plaintiff.

Resolution: No action taken. Major Bill Blaney states complaint was not timely filed. Issue referred to Caption Jones for investigation.

(1)

Item 7) 21-October 2006: Notification of Grievance regarding the 13-October, 2006 Informal Complaint on C.O. Maynard. Mr. Henricks was in surgery and recovery from August 20 until October 3, 2006, therefore contending a toll on limitations of presurgery complaints.

(Item 8) 26-October 2006 Notification of Grievance regarding the 6-October, 2006 Informal Complaint on Nurse Roger Kirk.

Item 9) 30-October, 2006 Disposition of Grievance,(No.10-06-014) Inspector of Institutional Services Mohammad A. Yakabu determines "this office will take no further action on this issue at this time." regarding the Notification of Grievance dated 12- October, 2006.

Item 10) 20-November, 2006, Informal Complaint Resolution regarding nerve damage affecting right leg. O.S.U. Neurologists examined Mr. Henricks at C.M.C. on 27-October, 2006; prescribed Neurontin. P.C.I. doctor altered pain medication.

Resolution: No action taken. P.C.I. Healthcare Administrator refers Mr. Henricks back to doctor complaint involved "via sick call"

Item 11) 7-November, 2006, Appeal to Chief Inspector regarding Grievance No. 11-06-014.

Item 12) 6-November, 2006, Disposition of Grievance N. 11-06-002. Inspector Yakabu determines "this office will take no further action on this issue at this time".

Item 13) 14-November, 2006, Appeal to the Chief Inspector regarding Grievance No. 11-06-002.

Item 14) 5-December, 2006, Decision of the Chief Inspector on a grievance appeal regarding Grievance nos. 1006014 and 1106002.

*Note: The is.

(2)

*Note: The above Appeals to the Chief Inspector included

all complaints up to the date of filing and were thus

all responded to by the Chief Inspector as follows:

(A)(1)(a) "C.O. Maynard was new and did pretty much [emphasis added] what he was told".

 (A)(2) "The officer did what he was directed to do 'once' [emphasis added] the other officer clarified the process for him."

(B) As to Nurse Kirk: "In conclusion, it is determined you received appropriate medical attention based on symptoms presented on 8/19/06."

Item 15) A supporting affidavit of prisoner Russell Riches Sr. that P.C.I. recklessly alters medications and treatments prescribed by specialists, and denies necessary and adequate medical care, as a matter of policy and custom.

(3)

# DECISION OF THE CHIEF INSPECTOR
## ON A GRIEVANCE APPEAL

| | | | |
|---|---|---|---|
| **NAME:** | **JOHN HENDRICKS** | **INSTITUTION:** | **PCI** |
| **NUMBER:** | **497-528** | **GRIEVANCE NUMBER (S):** | **10-06-014 & 11-06-002** |
| **DATE:** | **DECEMBER 5, 2006** | | |

The office of the Chief Inspector is in receipt of your notification of grievance, the disposition of that grievance, and your appeal to this office. A review of your appeal has been completed. The decision of the Inspector is hereby **AFFIRMED.**

According to your Notifications of Grievance 1006014 & 1106002 you suffered from an appendicitis from 8/19/06 to 8/20/06. You state in the Appeals "*The subject of monetary compensation for my own pain and suffering will be addressed through the appropriate legal channels; I do not suggest that they could be handled at this level. I am merely following the grievance procedure through to exhaustion, as a prerequisite to any legal action...*"

Nevertheless, I shall respond to this Appeal to the Chief Inspector.

According to the Inspector's Disposition of Grievance #10-06-014 you stated the Major's response to your untimely filing of informal complaint was not appropriate given the length of your hospitalization. While the Major indicated the timeliness of your informal complaint, he nevertheless assigned it to be investigated by a shift Captain so that your complaint could be investigated and any problem, policy or otherwise, can be appropriately addressed. Specifically, you object to the officer not removing your handcuffs at the request of the physician.

In Appeal to the Chief Inspector you reiterate the same complaint of questioning security practices. In researching this complaint I sought further information from the PCI Inspector. From the latter I learned Captain Foy was assigned to conduct the investigation. The Captain found that the officer was new and did pretty much what he was told, as far as having inmates at the OSU. According to procedure, inmates must always remain cuffed. If the Doctor directs that he needs to examine the inmate, the officer removes the arm cuffs off but leaves the shackles on. In this case, the officer did what he was directed to do once the other officer clarified the process for him. She added that being admitted is also one of the conditions under which the arm cuffs could be taken off.

According to the Inspector's Disposition of Grievance #11-06-002 you stated another request for monetary compensation for the alleged "inactions" of Nurse Kirk which you further allege, "almost nearly" cost you your life. In Appeal to the Chief Inspector you reiterate the same complaint by explaining the events of 8/19-20/06 with regard to Nurse Kirk's "inactions." You feel you were mis-diagnosed by Nurse Kirk as to having the flu.

In preparing my response I sought further information from your Medical File with the assistance of Nurse Roush and Inspector Yakabu. I have also reviewed in detail Nursing Protocol A-2.25 as well as your treatment record from 12:30 pm, 8/19 to 5:45 a.m. 8/20/06 (Saturday & Sunday) and until your

_____
Hugh J. Daley, R.N., B.S., M.A.
**ASSISTANT CHIEF INSPECTOR**

cc: **Inspector of Institutional Services**
    **Warden**
    **File**

sfer to OSU Emergency Room. According to the record you were seen as an emergency for iplaint of nausea, vomiting, and diarrhea, chills, and lethargy (*sluggishness*). You vital signs at that ,ie were 96.7 temperature, pulse of 86, and respirations of 16. Your blood pressure was 128/91. our oxygen saturation rate was 95%. Mr. Kirk gave you 30cc of Maalox and admitted you to Medical Bay for observation. At 3:45 p.m. you were released to your unit and advised to take Maalox 30cc by mouth after meals for nausea and/or vomiting. You were also instructed to return to MedBay if the signs and symptoms worsened. It is important to note that you did not complain of abdominal pain

At 5:15 a.m. the following morning (8/20) you returned to Med Bay as an emergency now complaining of right lower quadrant abdominal pain that spread down into your groin. At this time your were bending over grabbing your right side. Your vital signs at this time were 97.7 temperature, pulse of 103, and respirations of 20. Your blood pressure was 136/80. Dr. Akusoba was notified at 5:40 a.m. and you were sent to OSU Emergency Room.

It is significant to note that Nurse Kirk followed proper procedures in your case. When you first presented to Med Bay you did not have abdominal pain nor were your vital signs abnormal. He observed you for several hours per Nursing Protocol. He also correctly instructed you that should your condition worsen you were to return to Med Bay.

In conclusion, it is determined you received appropriate medical attention based upon symptoms presented on 8/19/06

No further action will be taken in regard to this appeal at this time.

Hugh J. Daley, R.N., B.S., M.A.
**ASSISTANT CHIEF INSPECTOR**

cc: **Inspector of Institutional Services**
**Warden**
**File**

| **DISPOSITION OF GRIEVANCE** | |
|---|---|

**GRIEVANCE CODE:** IA1

**RESOLUTION CODE:** B6

**INMATE:** John Henricks

**INSTITUTION:** PCI

**NUMBER:** A497528

**GRIEVANCE NUMBER:** 11-06-002

**DATE:** 11/6/2006

☐ The disposition of this grievance will be delayed longer than 14 calendar days for the following reason(s):

☐ Your grievance, filed on _____11/2/2006_____, has been reviewed and disposed of as follows:
                                              date

The office of the institutional inspector is in receipt of your grievance requesting monetary compensation for the alleged "inactions" of Nurse Kirk which you further allege, "almost nearly" cost you your life. Additionally, you state that Ms. Valentine, medical operations manager, has failed to respond to your informal complaint.

Please note, this office does not give moneatry award of any kind. The function of this office is to assure you have access to medical services. And, your informal complaint dated 10/06/06, was received by Ms. Valentine on 10/13/06 and responded to on 10/17/06 well within the timeframe specified by AR 5120-9-31, inmate grievance procedure. (A copy is enclosed herewith). This office will take no further action on this issue at this time.

If you wish, you may appeal this decision to the Chief Inspector within 14 calendar days. Appeal forms are available in the office of the Inspector of Institutional Services.

_____
Inspector of Institutional Services

| DISPOSITION OF GRIEVANCE |
|---|

**GRIEVANCE CODE:** IA1

**RESOLUTION CODE:** A2

**INMATE:** John Henricks

**INSTITUTION:** PCI

**NUMBER:** A497528

**GRIEVANCE NUMBER:** 10-06-014

**DATE:** 10/30/2006

☐ The disposition of this grievance will be delayed longer than 14 calendar days for the following reason(s):

☐ Your grievance, filed on ____10/24/2006____, has been reviewed and disposed of as follows:
date

The office of the institutional inspector is in receipt of your grievance regarding the Major's response to your informal complaint. You stated that the Major's response to your untimely filing of informal complaint was not appropriate given the length of your hospitilization.

While the Major indicated the untimeliness of your informal complaint, he nevertheless assigned it to be investigatede by a shift Captain. That was so your complaint could be investigated and any problem, policy or otherwise, can be appropriately addressed. This office will take no further action on this issue at this time.

If you wish, you may appeal this decision to the Chief Inspector within 14 calendar days. Appeal forms are available in the office of the Inspector of Institutional Services.

_____
Inspector of Institutional Services

# Informal Complaint Resolution

Institution: _____

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the supervisor of the staff person or department most responsible for complaint; Forward Pink copy to the Inspector; and keep the Goldenrod copy.*

| Submitted To: O.S.I. Health Care Administrator | | Date Submitted: 11/20/06 |
|---|---|---|
| Inmate's Name: Tina Hendricks | Number: 407 528 | Housing Assignment: A-1-W-73 |

**Complaint Regarding:** I suffered nerve damage to a nerve leading to my right leg, the result of surgical error, on 3/20/06, at O.S.U. Medical Center. An E.M.G., done on 10/11/06, at C.M.C., verifies this. My I was told that this damage is irreversable. A follow-up visit to a Neurologist on 10/1/06, here at C.M.C., confirmed this diagnosis. This Neurologist asked what, if anything, I was receiving for the excruciating pain in my right thigh, and I informed her that all I was currently being given was 300mg. Thereafter. She stated that "no amount of this medication will do anything for neurological pain", and so prescribed another pain medication, 'neurontin', which she stated was specifically for such pain.

After several days, I finally began receiving this medication at P.C.I., but after a few days, I still did not notice any measurable relief, so I submitted a Healthcare Request, to discuss the possibility of having the 300mg. dosage increased, as I spoke to several other inmates also on this medication, and learned that their pain was managed much more effectively with a higher dosage.

The 'doctor' here at P.C.I. stated that "no amount of Neurontin will do anything for neurological pain", and soon discontinued this prescription altogether. She also echoed the neurologists' prognosis, that the damage was not repairable, and that I would have to learn to live with it. She also stated that,"when I was born again, I would be pain-free", and that the F.D.A. had not approved Neurontin for such pain.

I question this statement, as I seen 3 fellow specialists in the field of neurology above her; regardless, I don't really care if the F.D.A. has approved such drugs or not, if it is proven to help with pain, it is unethical to deny a person medication, such a debilitating injury should be treated, I should be getting it, too. If it is unethical, then so is their actual pain-medication. If this doctor is not willing to follow the advice of specialists in their fields, why and how does she have to begin with?

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):

| Staff Member's Signature and Title: | Date: |
|---|---|

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                                                 ACA 4271



# Appeal to the Chief Inspector

Name: John Henricks

Number: 497-528

Institution: P.C.I.

Grievance No. 11-06-007

Date: 11/14/06

---

**INSTRUCTIONS:** Complete Appeal form. Attach a copy of the Notification of Grievance, Disposition of Grievance, and Supplemental Disposition of Grievance, and/or informal complaint, if used. Submit to: **CHIEF INSPECTOR, 1050 Freeway Dr. North; Columbus, Ohio; 43229.**

---

**I am appealing the decision of the Managing Officer and/or the Inspector of Institutional Services concerning my Grievance, for the following reason(s):** First of all, my Informal Complaint of 10/20/06 to the Healthcare Administrator, a copy of which was also sent to the Institutional Inspector at P.C.I., was not yet responded to(I had not yet received a response) on or about 10/20/06, so I kited the Institutional Inspector about the delay. As of 10/26/06, I had received neither a response from my Complaint nor my kite, so I feel I was well within my bounds to move this Complaint to the Grievance stage.

I received Ms. Valentine's response to my Informal Complaint on 10/30/06. In her response, she indicates that I was appropriately seen, diagnosed, and transported to C.S.U., where appropriate treatment was rendered. This statement was true, as to the events of 8/20/06, to a point. However, she fails to even acknowledge the fact that I had been previously been seen by Nurse Roger Kick, on 8/19/06, and that I had been inappropriately misdiagnosed as suffering from "the flu"; nor does she acknowledge the fact that I was again seen by, and again misdiagnosed by, Roger Kick, on the morning of 8/20/06.

Ms. Valentine also fails to mention the fact that, had Nurse Guy Barker not intervened on 8/20/06, correctly diagnosed my condition as acute appendicitis, and called Dr. Gonzales at her home, .......

This level of incompetence within the prison's healthcare department is not acceptable.

........

Signature of Inmate:



ACA 4271

# Appeal to the Chief Inspector

Name:

Number:

Institution:                     Grievance No.                     Date:

*INSTRUCTIONS:       Complete Appeal form. Attach a copy of the Notification of Grievance, Disposition of Grievance, and Supplemental Disposition of Grievance and/or informal complaint, if used.   Submit to: CHIEF INSPECTOR, 1050 Freeway Dr. North; Columbus, Ohio; 43229.*

**I am appealing the decision of the Managing Officer and/or the Inspector of Institutional Services concerning my Grievance, for the following reason(s):**

The facts as stated in my Informal Complaint have not changed. While I appreciate the Major's efforts to order further investigation into this matter, I cannot be disposed that, as such, in taking the appropriate step in providing all parties involved in America, resolution of the Grievance process.

... is in a position to negotiate a cash settlement directly, thereby avoiding legal action.

My Complaint(s) against the Medical Dept. at P.C.I., as well as various named individuals within that department are currently being addressed separately, at this time, though in all likelyhood will become a part of a single lawsuit, if this course of action is necessary.

As indicated by the Captain's remarks in his note to the Major,(see Informal Complaint Resolution) the officer states that he did not 'think' that he could take restraints off...If the officer was not aware of the policies regarding transport of injured or ill inmates to outside medical facilities, then perhaps he should not have been put in such a position as to unnecessarily delay much needed emergency medical care. Particularly in such a case as mine, where every second could make the difference between life and death.

Signature of Inmate: _____   477-528

# NOTIFICATION OF GRIEVANCE

| Name: John Hendricks | Institution: P.C.I. |
|---|---|
| Number: 497-528 | Grievance No. (To be completed by Inspector's Office): |
| Housing Assignment: A-1-W-73 | Date: 10/26/06 |

A. Explain your complaint. (Be specific. Address only one incident or concern. Include what would solve your complaint.)  As I have not received a response from P.C.I. Healthcare Admin-istrator on my Informal Complaint of 10/06/06, I must consider her silence as an acquiescence to the facts as stated in my Complaint, and move this Complaint to the Grievance stage.

The facts have not changed in this case, with one exception, and this exception does nothing to vindicate Nurse Roger Kirk. The additional facts concerning these incidents are as follows:

On the morning of 8/20/06, Nurse Kirk was not the only Med-bay employee pres-ent, as Previously stated. Also present was Nurse Guy Barker, who recognized my symptoms as possible acute appendicitis and, acting against Mr. Kirk's wishes, took it upon himself to call the P.C.I. doctor at her home. Nurse Barker persuaded the doctor that, in his opinion, my condition was far more critical that Mr. Kirk had surmised, and that a trip to O.S.U. Medical Center was not only warranted, but vital. Dr. Gonzales then made the decision to send me to O.S.U., and Mr. Bar-ker, I believe, then called security, to arrange for my transportation.

The fact that Nurse Guy Barker's actions almost certainly saved my life does not negate the fact that Nurse Roger Kirk's inactions very nearly cost me my life. And would have, I have been told by doctors at O.S.U., without the intervention by Mr. Barker.

As to what would solve my complaint, I believe I have made quite clear in my Informal Complaint. $$$$$

B. I will experience a substantial risk of **PHYSICAL INJURY** if this grievance is not promptly addressed.
☐ Yes   ☒ No

C. I filed an informal complaint on __10/06/06__ with **Ms. Valentine, Healthcare Administrator**
Date      Name                              Position
(Attach informal complaint resolution).

D. I have read Administrative Regulation 5120-9-31.   ☒ Yes   ☐ No

Inmate Signature: _John Hendricks_   497-528

DRC 4088 (Rev. 11/01)     DISTRIBUTION:   WHITE & CANARY - Inspector     PINK - Inmate     ACA 4271, 4331

# Informal Complaint Resolution

Institution:

P.C.I.

*To be completed by inmate. Forward the white, Canary & Goldenrod copies to the supervisor
of the staff person or department most responsible for complaint. Forward Pink copy to the Inspector.*

Submitted To: Major Blaney

Date Submitted: 10/13/06

Inmate's Name: John Henricks

Number: 497-528

Housing Assignment: D-2-4-7

Complaint Regarding: C.O. Maynard:

I was transported to O.S.U. Medical Center early Saturday morning, 8/20/06, for what turned out to be a ruptured appendix. Officer Maynard and another officer provided transport.

Upon arrival at O.S.U., the doctor responsible for my triage requested that cuffs and shackles be removed, so that I could be undressed for the purposes of the required examination, and this officer steadfastly refused to do so. His excuse was that he could not do so until I had been officially admitted.

The doctor attempted to explain to this officer that a thorough examination would determine whether admission would be necessary, and his request was still denied.

I finally told the doctor that, if the officer would not remove the restraints, to go ahead and cut the damned jumpsuit off.

Then, at some point, the doctor relented and said that, yes, he was admitting me, just to have the restraints removed so he could do his job.

I have no accurate estimate of how many minutes my care was delayed by this officer's attitude, but in my condition at the time, time was of the essence. Every additional MOMENT OF DELAY PUT ME ONE MOMENT CLOSER TO DEATH. And medical records will verify that I was damned close.

This officer will undoubtedly be named as a co-defendant in a forthcoming lawsuit, as well as any superior officers that condone such actions as being within "policy regulations". When such "policies" unduly and unnecessarily further endanger the very lives of inmates, it is high time such "policies" are revisited.

*To be completed by the supervisor of the staff person or department (respondent) most responsible for complaint.
Return Canary copy to inmate within 5 working days. Send white copy to the Inspector and keep Goldenrod copy.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*).:

*[handwritten response, illegible]*

Staff Member's Signature and Title: *[signature]*

Date: *[handwritten]*

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DISTRIBUTION: WHITE/ CANARY & GOLDENROD - Respondent (*Respondent will respond and forward the WHITE COPY to the Inspector and the CANARY COPY back to the inmate & will keep the GOLDENROD COPY*) PINK - Inmate sends to the Inspector

DRC 4151 (Rev 10/96)

# Informal Complaint Resolution

| Institution: |
|---|
| P.C.I. |

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the supervisor of the staff person or department most responsible for complaint; Forward Pink copy to the Inspector; and keep the Goldenrod copy.*

| Submitted To: | Date Submitted: |
|---|---|
| P.C.I. Health Care Administrator | 10/06/06 |

| Inmate's Name: John Henricks | Number: 497-528 | Housing Assignment: D-8-5 |
|---|---|---|

**Complaint Regarding:** I went to med-bay on 8/19/06, at approx. 1:45 p.m. complaining of severe abdominal pain. I was examined by Nurse Roger Kirk, who told me it was definitely NOT my appendix; he said it was merely 'the flu', handed me a bottle of Maalox, and advised me to return to my unit and 'let it run it's course'.

Sometime around 4:00 a.m. on 8/20/06, I awoke in SEVERE PAIN, reported this to the unit C.O., and was eventually taken back to med-bay. Nurse Roger Kirk was again working; he again said it was just 'the flu', and advised more bedrest. I explained that my pain was far too severe to be 'just the flu'; he again poked and prodded my abdomen, and again stated it was definitely NOT my appendix.

After much argument, he relented, and called for transportation to O.S.U. Upon arrival at O.S.U. Med. Ctr., the attending Dr. in E.R., after only the briefest examination, admitted me and immediately rushed me upstairs for emergency my surgery appendix, it turns out, had not only ruptured, but was in fact completely gangrenous, and major surgery was required. I spent a total of 6 weeks in the hospital, and several more months of recuperation, and possibly further surgery, will be necessary. This for what is increasingly being taken care of on an out-patient basis, had staff here at P.C.I. correctly identified my problem from day one.

I was likely hours, if not minutes, from possible death, needlessly, because of the negligence of P.C.I. Med. Dept. staff.

As for suggesting a remedy to this situation, I am asking, at an amount to be determined later by my Attorney, monetary compensation for my needless pain and suffering, disfiguration as a result of this extensive surgery, and possibly more, to be determined at a later date. I do not expect this to be resolved at this level, but am merely following the greivance procedure through exhaustion.

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):

| Staff Member's Signature and Title: | Date: |
|---|---|
| | |

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                                                 ACA 4271

# NOTIFICATION OF GRIEVANCE

| Name: John Hendricks | Institution: P.C.I. |
|---|---|
| Number: 497-528 | Grievance No. (To be completed by Inspector's Office): |
| Housing Assignment: D-2 Unit, Bay 4, Bed 7 | Date: 10/21/06 |

A. Explain your complaint. (Be specific. Address only one incident or concern. Include what would solve your complaint.)

I was hospitalized continuously, from the date of this incident, until discharged from C.M.C. on 10/03/06. As per my conversation with the Institutional Inspector on 10/04/06, the 14-day limitation for filing any complaints relative to the incident(s) of 8/19/06 and 8/20/06 does not expire until 10/18/06. Therefore, my Informal Complaint filed on 10/13/06 was timely.

I would hope that, regardless of the timeliness of such a serious complaint as this, that the issue would still merit further investigation. Regardless, I believe the Major's response entitles me to move this complaint to the Notification of Grievance level. The facts as stated in the attached Informal Complaint Resolution have not changed and, I believe, speak for themselves.

B. I will experience a substantial risk of **PHYSICAL INJURY** if this grievance is not promptly addressed.  ☐ Yes  ☒ No

C. I filed an informal complaint on ___10/13/06___ with ___Major Blaney___
                                          Date                           Name                      Position
   (Attach informal complaint resolution).

D. I have read Administrative Regulation 5120-9-31.  ☒ Yes  ☐ No

Inmate Signature: *John K. Hendricks #497-528*

DRC 4088 (Rev 11/01)   DISTRIBUTION:   WHITE & CANARY - Inspector   PINK - Inmate   ACA 4271, 4331

# Informal Complaint Resolution

Institution: **P.C.I.**

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the supervisor of the staff person or department most responsible for complaint; Forward Pink copy to the Inspector; and keep the Goldenrod copy.*

Submitted To: **P.C.I. Health Care Administrator**

Date Submitted: **10/06/06**

Inmate's Name: **John Henricks**  Number: **497-528**  Housing Assignment: **D-8-5**

Complaint Regarding: I went to med-bay on 8/19/06, at approx. 1:45 p.m. complaining of severe abdominal pain. I was examined by Nurse Roger Kirk, who told me it was definitely NOT my appendix; he said it was merely 'the flu', handed me a bottle of Maalox, and advised me to return to my unit and let it run it's course.

Sometime around 4:00 a.m. on 8/20/06, I awoke in SEVERE PAIN, reported this to the unit C.O., and was eventually taken back to med-bay. Nurse Roger Kirk was again working; he again said it was just 'the flu', and advised more bedrest. I explained that my pain was far too severe to be 'just the flu'; he again poked and prodded my abdomen, and again stated it was definitely NOT my appendix.

After much argument, he relented, and called for transportation to O.S.U. Upon arrival at O.S.U. Med. Ctr., the attending Dr. in E.R., after only the briefest examination, admitted me and immediately rushed me upstairs for emergency. My surgery. appendix, it turns out, had not only ruptured, but was in fact completely gangrenous, and major surgery was required. I spent a total of 6 weeks in the hospital, and several more months of recuperation, and possibly further surgery, will be necessary. This for what is increasingly being taken care of on an out-patient basis, had staff here at P.C.I. correctly identified my problem from day one.

I was likely hours, if not minutes, from possible death, needlessly, because of the negligence of P.C.I. Med. Dept. staff.

As for suggesting a remedy to this situation, I am asking, at an amount to be determined later by my Attorney, monetary compensation for my needless pain and suffering, disfiguration as a result of this extensive surgery, and possibly more, to be determined at a later date. I do not expect this to be resolved at this level, but am merely following the greivance procedure through exhaustion.

RECEIVED OCT 13 2006

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint. Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):
10/17/06 Sir, you were seen and assessed appropriately by the nursing staff and treatment was rendered appropriately. You were diagnosed with "acute appendicitis." You were transported to OSU and appropriate treatment was rendered.

Staff Member's Signature and Title: ___ M.O.N.  Date: 10/17/06

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)  ACA 4271

# Informal Complaint Resolution

Institution: C.M.C.

*To be completed by inmate. Forward the white, Canary & Goldenrod copies to the supervisor of the staff person or department most responsible for complaint. Forward Pink copy to the Inspector.*

Submitted To: C.M.C. HEALTH CARE ADMINISTRATOR

Date Submitted: 9-29-06

Inmate's Name: JOHN HENRICKs   Number: 497-538

Housing Assignment: 3-SOUTH 379-2

Complaint Regarding: I had emergency surgery at O.S.U. med. Ctr., on 8-24-06. Ever since my surgery, I have had almost no feeling in my right thigh. I have pointed this out to staff ever since. I came here on 8-25-06, and have discussed this at length with doctors, nurses, many times. Finally, 2½ weeks ago, the doctor here, and a surgery rep from O.S.U. reccommended a Neurology Consult. The doctor here, as well as nurse, were suprised that I was not seen at Neuro. Clinic, on 9-22. So was I. This morning, I asked my nurse to confirm that I would be seen today at Neuro. Clinic, and was told that my consult has been scheduled for 10-27-06 ?! Over two months after this condition presented itself, and has been pointed out by me, to doctors and nurses at both facilities, before I will be examined by neurology 's simply not acceptable. The doctor here also ordered tests on my leg over 3 weeks ago, which have not happened yet. I believe these tests, as well as neurology exam at friday clinics, would all be done in-house, with no need for a round-trip outside this facility. So what is the ____ delays?

*To be completed by the supervisor of the staff person or department (respondent) most responsible for complaint. Return Canary copy to inmate within 5 working days. Send white copy to the Inspector and keep Goldenrod copy.*

Action Taken (*Cite appropriate policy, procedure or regulation in response*).: The appointments have to be scheduled. OSU schedules not CMC. you are scheduled if you are having discomfort you need to let the docter know.

Staff Member's Signature and Title: [signature]

Date: 10/11/06

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DISTRIBUTION: WHITE/ CANARY & GOLDENROD - Respondent (*Respondent will respond and forward the WHITE COPY to the Inspector and the CANARY COPY back to the inmate & will keep the GOLDENROD COPY*) PINK - Inmate sends to the Inspector
DRC 4151 (Rev 10/96)

# Informal Complaint Resolution

Institution:

*To be completed by inmate. Forward the white, Canary & Goldenrod copies to the supervisor of the staff person or department most responsible for complaint. Forward Pink copy to the Inspector.*

Submitted To: Health Care Adminor Nurse Super    Date Submitted: 9-2-06

Inmate's Name: John Hendricks    Number: 497-528    Housing Assignment: 3-5-379

Complaint Regarding: Although I don't like being woken in the wee hours of the morning, I am told that it is vital to my recovery that my wound dressings be changed at 8 hour intervals, minimum.

This means at least once per shift. However, my dressings were not changed on Friday P.M. — Sat. a.m. shift. I lie half-awake expecting these nightly visits, and don't believe I was simply to dazed to remember something as discomforting as a change of wound dressings, though I guess it could be possible. A check of nurses records for this shift should either confirm or deny.

---

*To be completed by the supervisor of the staff person or department (respondent) most responsible for complaint. Return Canary copy to inmate within 5 working days. Send white copy to the Inspector and keep Goldenrod copy.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*).: PT. Hendricks A497528 Clarified Friday p.m. — Sat. A.m. shift to be third shift. According to this explanation, the dressing was done on 3rd shift by Ms Williams and documented. Ms Towers worked third shift and per record, dressing was done. Staff is notified to have dressing done every shift as ordered and document. Nursing supervisor will monitor.

Staff Member's Signature and Title: Nengubellah BS, RN    Date: 09/08/06.

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DISTRIBUTION: WHITE/ CANARY & GOLDENROD - Respondent (Respondent will respond and forward the WHITE COPY to the Inspector and the CANARY COPY back to the inmate & will keep the GOLDENROD COPY) PINK - Inmate sends to the Inspector
DRC 4151 (Rev 10/96)

# Informal Complaint Resolution

Institution:

To be completed by inmate. Forward the white, Canary & Goldenrod copies to the supervisor
of the staff person or department most responsible for complaint. Forward Pink copy to the Inspector.

Submitted To: Nurses' Supervisor - Chris

Date Submitted: 9-10-06

Inmate's Name: John Henricks    Number: 497-528    Housing Assignment: 3-5-379

Complaint Regarding: For the second time in as many weeks, 3rd shift has neglected to change my dressings, as the surgeon ordered. This ~~was~~ was on 9-7-06. Also, when I spoke with 2nd shift nurse about changing then and mentioned that I'd gone 16 hours between previous changes, she did not know that she was also required to change them and further, she didn't give a damn what the surgeon ordered; she would change them whenever she got around to it, this on 9-8-06. On 9-9-06, the ~~second~~ (first) shift nurse, while changing my dressings, because he had no

To be completed by the supervisor of the staff person or department (respondent) most responsible for complaint.
Return Canary copy to inmate within 5 working days. Send white copy to the Inspector and keep Goldenrod copy.

Action Taken (Cite appropriate policy, procedure or regulation in response):

Your complaints are being looked into and
will be addressed with the staff concerned.

Staff Member's Signature and Title: [signature]

Date: 9/12/06

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DISTRIBUTION:    WHITE/ CANARY & GOLDENROD - Respondent. (Respondent will respond and forward the WHITE COPY to the Inspector and the CANARY COPY back to
the inmate & will keep the GOLDENROD COPY)    PINK - Inmate sends to the Inspector

DRC 4151 (Rev 10/96)

# Informal Complaint Resolution

Institution:

To be completed by inmate. Forward the white, Canary & Goldenrod copies to the supervisor
of the staff person or department most responsible for complaint. Forward Pink copy to the Inspector.

Submitted To: Nurses' Supervisor - Chris's

Date Submitted: 9-10-06

Inmate's Name: John Henricks

Number: 497-528

Housing Assignment: 3-5-379

Complaint Regarding: sterile saline on his cart, applied Hepa-Clean to sponge~~clean~~ my wound, then went into our bathroom to further moisten them, with tap water! He then "cleaned" my wound with them, not even bothering to change gloves, after touching bathroom door handle and faucet. I am no doctor, but I believe that the most sterile conditions available are essential when dealing with wounds such as mine, and this was definitely not the case here.

To be completed by the supervisor of the staff person or department (respondent) most responsible for complaint.
Return Canary copy to inmate within 5 working days. Send white copy to the Inspector and keep Goldenrod copy.

Action Taken (Cite appropriate policy, procedure or regulation in response).:

Complaints will be address as soon as possible.

Staff Member's Signature and Title: _____

Date: 9/12/06

Complaints not resolved may be addressed in accordance with 5120-9-31.

DISTRIBUTION: WHITE/ CANARY & GOLDENROD - Respondent (Respondent will respond and forward the WHITE COPY to the Inspector and the CANARY COPY back to the inmate & will keep the GOLDENROD COPY) PINK - Inmate sends to the Inspector

DRC 4151 (Rev 10/96)

STATE OF OHIO      )
                    ) SS:
COUNTY OF PICKAWAY )

AFFIDAVIT OF:

RUSSELL RICHES SR.

INMATE No. 558-667

I, Russell Riches Sr., having first been duly sworn, declare under penalty of perjury that;

1.) I am currently imprisoned at Pickaway Correctional Institut-ion, 11781 St. Rte.762, P.O. Box 209, Prient, Ohio, 43146;

2.) I arrived at P.C.I. on March 7, 2008;

3.) I filed an Informal Complaint on April 10, 2008, regarding the following;

A.) I have seen Dr. Lockhart, the institution's physician on several occasions. On each occasion, I attempted to address med-ical concern that were diagnosed prior to my arrival at P.C.I., whereas;

(a) I have been denied further telemed conferences with my assigned Corrections Medical Center (C.M.C.) primary caregiver Dr. Hartz, and;

(b) I have been denied treatment for previously diagnosed rheumatoid arthritis, and;

(c) I have been denied consultation with Orthopedic surgeon, and;

(d) I have been denied treatment for severe adema in my legs, and;

4.) I have been emergency transported to Ohio State University Medical Center on three separate occasions, for shortness of breath, numbness, and severe chest pains.

5.) Dr. Hartz is an O.S.U. doctor who holds clinics at C.M.C..

6.) Dr. Hartz exhibited serious concern regarding my chest pains and uncontrollable blood pressure;

7.) Dr. Lockhart has denied me further consults with Dr. Hartz.

8.) Orthopedic surgeon Dr. Benjamin Salpietro previously diag-nosed my arthritis problems as:

page 1 of 4

8.)cont.

    (a) Left knee: 60% mediac meniscus remaining;

    (b) Right knee: 25% mediac meniscus remaining;

9.) Due to my extremely limited mobility, knee braces were ordered to help strengthen and stabilize my legs, by Dr. Salpietro.

10) Dr. Lockhart refuses to address my need for these braces, which without I experience excruciating pain and swelling;

11.) Dr. Lockhart did offer to prescribe Tylenol or Ibuprofen, neither of which is effective in controlling my pain, and both of which cause unwelcome side effects, which I have informed Dr. Lockhart of, on several occasions;

12.) On Thursday, May 29, 2008, at approximately 1830 hours, I was seen by P.C.I. medical staff for chest pain, shortness of breath, and high blood pressure, and Dr. Lockhart was immediately notified via telephone. I was told afterwards "You'll see her tomorrow."

14.) On Friday, May 30, 2008, at approximately 1230 hours, I arrived at P.C.I. medbay, per the pass I received, only to be told I would not be seen by Dr. Lockhart that day, but rescheduled to see Dr. Stevens on Saturday, May 31, 2008.

15.) Satruday, May 31, 2008, at Approximately 800 hours I went back to medbay and, following a cursory exam by Dr. Stevens, I was rushed to O.S.U. by emergency squad.

16.) Doctors at O.S.U. prescribed Altram and Torodol for my pre-existing pain attributed to current stress , thus enhancing blood pressure problems, which O.S.U. doctors were treating, as well.

17.) When returned to P.C.I., after having been stabilized with medication(s), Doctor Lockhart changed the prescriptions, including my blood pressure meds, without even examining me.

18.) Dr. Lockhart substituted the Altram and Torodol with Ibuprofen, even after I reminded her of the ineffectiveness and side effects that such medications.

19.) Cardiologist Dr. Thomas Pappas prescribed medications with specific directions as to dosage, and further ordered continuing telemed conferences.

20.) Dr. Lockhart denied the medications prescribed, as well as further telemed consults.

21.) On May 31, 2008, O.S.U. emergency room Dr. Mitchel personally telephoned P.C.I. with my medication orders.

22.) Dr. Lockhart refused to comply with Dr. Mitchell's orders, without examining me.

23.) P.C.I. nurse Thompson informed Corrections Officer Smith that I had only been faking chest pains.

24.) After Nurse Thompson's false allegations, Nurse Birdie read the O.S.U. record and diagnosis, which confirmed injury;

25.) Nurse Birdie also took my vital signs, on June 1, 2008, at approximately 900 hours, which were as follows:

   (a) Welch/Alvin blood pressure machine: 202/124
   (b) Blood pressure by manual cuff:      172/110
   (c) Body temperature:             98 degrees
   (d) Body weight:                 280 pounds

26) On June 1, 2008, I filed an Informal Complaint with health-care Administrator regarding;

   A.) Eight weeks ago Dr. Muhammad ordered an orthopedic consult, hinged bilateral knee braces, and compression socks.

27.) As of June 4, 2008, I have received none of those things.

28.) I have sleep apnea, and require a life-supporting breathing machine when I sleep, commonly referred to as a C-CAP machine.

29) On April 20, 2008, I gave Ms. Ackly (Med facilitator) broken parts to my C-CAP machine, as well as a set of used filters, to use as a guide for ordering replacement parts. (My machine was damaged during transport to P.C.I.)

30.) Ms. Ackley indicated it would only take a few days to get the needed parts, but its now been over six weeks, and still I have no new parts.

31.) When I was admitted to O.S.U. on May 1, 2008, the officer who packed my property regarded my C-CAP machine filter as contraband, and disposed of same.

<div align="right">page 3 of 4</div>

32.) As of this writing, my C-CAP machine is being held together with tape, and is not operating at full potential, due to the missing parts.

33.) Without clean filters for my C-CAP machine, the threat of contamination is extremely high.

34.) On May 9, 2008, C.M.C. medical staff informed me that the previously ordered consult appointments were already scheduled on their end.

35.) On the date Id., I was diagnosed with ulcerated stomach, and instructed not to use medications such as Ibuprofen and Tylenol.

36.) As of this writing, I remain in excruciating pain, with the only medication Dr. Lockhart will allow me, Tylenol or Ibuprofen, the very same medications that have caused and/ or significantly contributed to my ulcered stomach, and none of the previously scheduled telemed conferences have not been forthcoming.

37.) By affixing my signature to this document, I solemnly swear to its accuracy, to the best of my knowledge, information, and belief.

AFFIANT FURTHER SAYETH NAUGHT:

_____
Notary Public

My commission expires
on:_____ 10 30 2010



MADELINE N RHODES
Notary Public
In and for the State of Ohio
My Commission Expires
October 30, 2010

_____
Russell Riches Sr.
Affiant. Inmate #558-667
Pickaway Correctional
Institution,
11781 St. Rte. 762,
P.O. Box 209,
Orient, Ohio, 43146

page 4 of 4.

# Informal Complaint Resolution

Institution: P.C.I.

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

Submitted To: _Health Care Administrator_    Date Submitted: _1 Jan 08_

Inmate's Name: _Russ Bellisy_    Number: _758-167_    Housing Assignment: _12-C 1_

**Complaint Regarding:** _Over 8 weeks waiting on_ (illegible handwritten text)

(several lines of illegible handwritten text)

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken (*Cite appropriate policy, procedure or regulation in response*):**

Staff Member's Signature and Title:    Date:

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)

ACA 4271

# Informal Complaint Resolution

Institution:

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

Submitted To:                                                                 Date Submitted:

Inmate's Name:                              Number:                Housing Assignment:

Complaint Regarding:

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):

Staff Member's Signature and Title:                                         Date:

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                                                ACA 4271

# Informal Complaint Resolution

Institution: PCI

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the supervisor of the staff person or department most responsible for complaint; Forward Pink copy to the Inspector; and keep the Goldenrod copy.*

Submitted To: Dan LaZaroe / Warden @ PCI   Date Submitted: 1 Jun 2008

Inmate's Name: Russ Riches, SR   Number: A558-667   Housing Assignment: 12-C-001

Complaint Regarding: Thurs. 29 May 08 @ Appx. 1830 I was seen by P.C.I. Medical staff for chest pain, high blood pressure, shortness of breath. Dr. Lockhart was notified, response was, "You'll see her tomorrow".

Fri. 30 May 08 @ Appy. 1230 I arrived at Med Bay, only to be told I was not to see Dr. Lockhart, but to see Dr. Strunus on Sat 1/31/08.

Sat. 31 May 08 @ Appx. 0800 I arrived at Med Bay. Speaking to Dr. Strunus as to what my difficulties are: she had me sent to Cell by squad. This makes Four (4) times, Staff _____ from _____ @ P.C.I., then _____ return to cell or by Ambulance !!

Dr. Lockhart _____

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken (Cite appropriate policy, procedure or regulation in response):**




Staff Member's Signature and Title:                     Date:

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                        ACA 4271

# Informal Complaint Resolution

Institution: P C I

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for*
*complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

| Submitted To: | Date Submitted: 15 Jan 2008 |
|---|---|
| Inmate's Name: Ross Dixon, Sr | Number: 158-667 | Housing Assignment: 12-C-001 |

Complaint Regarding: *[handwritten, largely illegible]* Blatantly altered my medications to the point of causing harm & pain to me. Ever since I arrived @ P.C.I. Dr. Locasure was relieved of ulceration / tercadion medications for [illegible], instead calling me ibuprofen. Due to Dr. Locasure [illegible], and serious [illegible] I have acquired an ulceration in my stomach... I never had a problem [illegible] Dr. Locasure [illegible] ... ever since Dr. [illegible] my blood pressure medications [illegible] ... 

*[remaining lines illegible]*

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken** *(Cite appropriate policy, procedure or regulation in response):*

| Staff Member's Signature and Title: | Date: |
|---|---|

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)          ACA 4271

# Informal Complaint Resolution

Institution: _P.C.I._

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint;  Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

Submitted To: _____   Date Submitted: _1 July 2008_

Inmate's Name: _____  Number: _____  Housing Assignment: _12-0001_

Complaint Regarding: _[handwritten text, largely illegible]_

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days.  Send White copy to the Inspector.*

**Action Taken** *(Cite appropriate policy, procedure or regulation in response):*

Staff Member's Signature and Title: _____   Date: _____

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                      ACA 4271

# Informal Complaint Resolution

Institution:

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

| Submitted To: | Date Submitted: |
|---|---|
| Inmate's Name: | Number: | Housing Assignment: |

## Complaint Regarding:

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken (*Cite appropriate policy, procedure or regulation in response*):**

| Staff Member's Signature and Title: | Date: |
|---|---|

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                                                 ACA 4271

# Informal Complaint Resolution

Institution:

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

| Submitted To: | | Date Submitted: |
|---|---|---|
| Inmate's Name: | Number: | Housing Assignment: |

**Complaint Regarding:**

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint.*
*Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

**Action Taken** (*Cite appropriate policy, procedure or regulation in response*):

| Staff Member's Signature and Title: | Date: |
|---|---|

*Complaints not resolved may be addressed in accordance with 5120-9-31.*

DRC4151 (Rev 11/01)                                    ACA 4271

# Informal Complaint Resolution

| Institution: |
|---|
| [illegible] |

*Top section to be completed by inmate, within 14 days of incident.*
*Inmate will forward the White & Canary copies to the **supervisor** of the staff person or department most responsible for complaint; Forward Pink copy to the **Inspector**; and keep the Goldenrod copy.*

| Submitted To: [illegible] | | Date Submitted: [illegible] |
|---|---|---|
| Inmate's Name: [illegible] | Number: [illegible] | Housing Assignment: [illegible] |

**Complaint Regarding:** [illegible]

---

*Lower Section to be completed by the supervisor of the staff person or department most responsible for complaint. Return Canary copy to inmate within 7 calendar days. Send White copy to the Inspector.*

---

**Action Taken (*Cite appropriate policy, procedure or regulation in response*):**

| Staff Member's Signature and Title: | Date: |
|---|---|
| | |

*Complaints not resolved may be addressed in accordance with 5120-9-31.*